**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AISLEY DAVIS, JULIUS YARBOUGH, VALERIE ROBINS, MARISOL SCHARON and KATHRYN BOWMAN, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>BEIERSDORF, INC.,<br><br>               Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR FRAUD, DECEIT, AND/OR MISREPRESENTATION; VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT; FALSE ADVERTISING; NEGLIGENT MISREPRESENTATION; AND UNFAIR, UNLAWFUL, AND DECEPTIVE TRADE PRACTICES<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      Plaintiffs Aisley Davis, Julius Yarbough, Valerie Robins, Marisol Scharon and Kathryn Bowman, by and through their counsel, bring this Class Action Complaint against Beiersdorf, Inc. (referred to as "Defendant" or "Beiersdorf"), on behalf of themselves, and those similarly situated, for fraud, deceit, and/or misrepresentation; violation of the Consumer Legal Remedies Act; false advertising; negligent misrepresentation; unfair, unlawful, and deceptive trade practices, and unjust enrichment. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.      This case concerns Beiersdorf's "Nourish by Nature" and "Naturally Good" products sold under its "Nivea" brand, including Nivea "Nourish by Nature" lotions and Nivea "Naturally Good"  skin creams and related skin products, which Defendant sells using the false claim that they are comprised of specific proportions of "natural origin ingredients" (e.g., "99%

Natural Origin Ingredients") or "naturally-derived ingredients (e.g., "98% Naturally Derived Ingredients"). The products include, but are not limited to, Beiersdorf's Nivea "Nourish by Nature" body lotions and Nivea "Naturally Good" lotions, skin creams, and related skin products (collectively, "the Products").

3.    Defendant affirmatively represents that the Products have "X% Natural Origin Ingredients" (e.g., "99% Natural Origin" for the Nivea "Naturally Good" Organic Aloe Vera Radiance Cream) or "X% Naturally Derived Ingredients" (e.g., "98% Naturally Derived Ingredients" for Nivea "Nourish by Nature" lavender-enriched body lotion). Defendant makes this claim on the front labels of the Products' packaging. Defendant also represents to consumers that the Products are "X% naturally derived ingredients" on its website and related third-party retail websites. However, Defendant's representation regarding the Products is false and/or misleading.

4.    Defendant's labeling suggests to reasonable consumers nationwide that X% or more (generally, ≥ 95%) of the ingredients in the Products originate in nature or are derived naturally.

5.    In truth, almost all of the ingredients in the Products are synthetic, not natural. They do not originate in nature and are not derived naturally. Rather, they are of industrial-origin. Accordingly, even accounting for the fact that lotions and moisturizers are roughly 80% water, the Products are only approximately 80-85% natural origin or naturally-derived ingredients. As such, the "% Natural Origin" and "% Naturally-Derived" claims are false.

6.    In short, the Products do not contain the advertised proportion of natural ingredients. Many of the exact same ingredients are used in other skin products and are not—and never have been—considered "natural-origin." Even when these compounds can occur in nature (e.g., citric acid), they are not generally available from natural sources on the scale required for use in mass-produced products and instead created through industrial chemical processes for use in the Products.

7.    Beiersdorf's practice is also inherently deceptive and misleading. Based on Plaintiff's investigation, Beiersdorf is labeling the Products as X% Natural-Origin" or "X%

Naturally Derived" ingredients based on use of the proprietary standard ISO 16128 developed by the British Standards Institute ("BSI", a private, industry-based group). That standard uses a Byzantine method to calculate "natural origin" and "% natural-origin" in which one compares the mass of the atoms that were in a "natural" starting material to the total mass in an industrially-produced chemical made from that starting material to calculate the "% natural-origin" and/or "% naturally-derived." By doing this, the manufacturer is able to gaslight consumers by characterizing synthetic chemicals as "naturally derived" or "natural origin."

8.     Even if an average consumer could obtain the ISO 16128 standard (by paying fees of over $400 to the British Standards Institute), they would not understand it, because it is complicated and written for chemists. Indeed, the British Standard Institute acknowledged as much in the ISO 16128 publications, stating "Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), . . . characteristics of packaging materials or regulatory requirements applicable for cosmetics." In other words, the BSI states in the standard that it is not intended for use in product labeling and product communications. Despite this clear instruction not to use the standard for labeling claims or advertisements, Defendant has deceptively chosen to do so.

9.     Plaintiffs purchased the Products believing they were purchasing skin care products made predominantly of ingredients obtained directly from natural sources or derived in a natural manner, like aloe. Plaintiffs purchased the skin care products with "X% natural origin"/"naturally-derived ingredients" believing that the "natural origin"/"naturally derived ingredients" made the products better for the environment, safer, and better for their skin than products comprised of synthetic, industrially-produced chemicals.

10.     Through its marketing and advertising, Defendant intentionally misled and deceived Plaintiffs to believe that the Products were comprised of specific high proportions of ingredient directly derived from or originating in natural sources (e.g., extracted directly from plants) and had the attendant perceived benefits of natural ingredients.

11.     Defendant's marketing and advertising representations and omissions concerning the Products were directed at inducing, and did induce, Plaintiffs and Class Members to purchase

the Products when they would not have otherwise, or at higher prices than they would otherwise have paid, had they known the truth of the matter.

12.    Defendant knew that the Products it sold were not comprised of the advertised proportions of natural-origin/naturally derived ingredients, and that its advertising materials were false and deceptive in describing the Products as comprising the advertised proportions of natural origin/naturally derived ingredients.

13.    Despite knowing that its advertisements falsely and deceptively stated that the Products were made of "X% natural-origin/naturally derived ingredients," Defendant refused and failed to change the labels, remove the false representations, or otherwise inform Plaintiffs, those similarly situated and/or the general public of the Products true composition with respect to natural-origin ingredients.

## PARTIES

14.    Plaintiff Aisley Davis is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Douglas City, in Eureka County, California. Ms. Davis intends to remain in California and makes her permanent home there.

15.    Plaintiff Julius Yarbough  is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Vallejo in Solano County, California. Ms. Scharon intends to remain in California and makes her permanent home there.

16.    Plaintiff Valerie Robins is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Vacaville in Solano County, California. Ms. Scharon intends to remain in California and makes her permanent home there.

17.    Plaintiff Marisol Scharon is, and at all times alleged in this Class Action Complaint was, an individual and a resident of San Pedro in Los Angeles County, California. Ms. Scharon intends to remain in California and makes her permanent home there.

18.    Plaintiff Kathryn Bowman is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Carmichael in Sacramento County, California. Ms. Bowman intends to remain in California and makes her permanent home there.

19.    Defendant Beiersdorf, Inc. is a corporation formed under the laws of the state of Delaware, having its principal place of business in Stamford, CT.  Beiersdorf, Inc. markets and sells Nivea products across the United States, in particular via the Beiersdorf website, which it operates.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

21.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California and is a resident of California with its principal place of business within the State of California.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

23.    In accordance with California Civil Code Section 1780(d), Ms. Scharon concurrently files herewith a declaration establishing that she purchased Beiersdorf's "Nourish by Nature" Nivea body lotion in San Pedro, California in November of 2024. (Ms. Scharon's declaration is attached hereto as Appendix A.)

24.    In accordance with California Civil Code Section 1780(d), Ms. Davis concurrently files herewith a declaration establishing that he purchased Beiersdorf's "Naturally Good" Night Cream and "Naturally Good" Biodegradable Wipes in Redding, California in or around June of 2024. (Ms. Davis' declaration is attached hereto as Appendix B.)

25.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**SUBSTANTIVE ALLEGATIONS**

**The Market for Natural Beauty Products**

26.     The market for "natural" beauty products, including skin care, skin care and cosmetics, is large and growing. See, e.g., Soyoung Kim and Yoo-Kyoung Seock, IMPACT OF HEALTH AND ENVIRONMENTAL CONSCIOUSNESS ON YOUNG FEMALE CONSUMERS' ATTITUDE TOWARDS AND PURCHASES OF NATURAL BEAUTY PRODUCTS, Int. J. Consumer Studies, 33:627-238 (2009) (reporting global sales of $7B for "natural" beauty products in 2007, with expected growth rate of ~9% per year). Surveys of consumers in the United States and Europe show consistent demand for "natural" products, including those with natural ingredients. See, e.g., Seyoung Kim, IMPACT OF HEALTH AND ENVIRONMENTAL CONSCIOUSNESS ON YOUNG FEMALE CONSUMERS' ATTITUDE TOWARDS AND PURCHASES OF NATURAL BEAUTY PRODUCTS, Int. J. Consumer Studies, 33:627-238 (2009); Nora Amberg and Csaba Fogarassy, GREEN CONSUMER BEHAVIOR IN THE COSMETICS MARKET, Resources, 8:137 (2009) ("Currently, marketing trends are turning towards natural solutions for cosmetics. . . ."); Nora Amberg, APPEARANCE OF NATURAL COSMETICS IN CONSUMER BEHAVIOR RELATED TO COSMETICS IN HUNGARY, Visegrad J. Bioeconomy and Sustainable Dev., Vol. 12(2) at 71-74 (2023) ("Today, the development of healthier and more environmentally conscious lifestyle is increasing consumer perceptions and interest in natural products in particular, including cosmetics.").

27.     This desire for natural products stems from two material beliefs among consumers: (i) the belief that natural products are safer and/or better for one's body and (ii) the belief that natural products are better for the environment. See Kim, Int. J. Cons. Studies at abstract; Amberg, Resources at 2-3 (discussing association of natural cosmetics with "healthy lifestyle" and "environmental protection and sustainability questions").

28.     Studies show that these consumer preferences translate into increased purchases of "natural" products. See Kim, Int. J. Cons. Studies at 627 (finding environmentally-conscious and health-conscious consumers were more likely to purchase "natural" products, and were willing to pay more for them); Amberg, Visegrad J. Bioeconomy and Sustainable Dev., at 72 (70% of respondents willing to pay more for a cosmetic with a natural ingredient).

CLASS ACTION COMPLAINT

29.     According to the survey data available, consumers who display these purchasing preferences, particularly environmentally-conscious consumers, place high importance on "no use of chemical ingredients." Kim, Int. J. Cons. Studies at 633; *see also id.* at 636 ("This finding is consistent with the observation made in a previous survey of UK consumers, conducted by Organic Monitor (2007) that consumers; major concern in the purchase of natural and organic beauty products is absence of synthetic chemicals."). In this context, "chemical ingredients" means synthetic or man-made chemicals. See, e.g., Oxford Dictionary ("chemical" = "a compound or substance that has been purified or prepared, especially artificially."), available via Google.com (accessed Jan. 18, 2024); Mirriam-Webster Dictionary ("a substance obtained by a chemical process or producing a chemical effect"), available via https://www.merriam-webster.com/dictionary/chemical (accessed Jan. 18, 2024); see also Jiali Zhang and Meijuan Zhou, Factors Influencing Consumers' Purchasing Behavior in Natural Cosmetics, Univ. Uppsala Master's Thesis (2009), at 1 (defining "natural" products as those "mainly made of plant materials from agricultural-based production"; Amberg, Resources at 2-3 ("Green or natural cosmetics are made out of natural resources, without the use of chemicals, coloring additives, or other non-natural mixtures.").

30.     At the same time, consumers' ability to discern between truthful and false or deceptive claims is limited. Jiali Zhang and Meijuan Zhou, Factors Influencing Consumers' Purchasing Behavior in Natural Cosmetics, Univ. Uppsala Master's Thesis (2009), at abstract ("Although consumers' need for a healthy and sustainable lifestyle drives natural cosmetic consumption, various claims of natural cosmetics make consumers confused and distrustful." Noting further that "lack of knowledge" and "non-harmonized certifications" led to "inconsistency between consumers' purchasing intention and actual behavior."); Kim, Int. J. Cons. Studies at 635 (finding health and environmentally-conscious consumers "did not spend more time and effort than others on comparing alternative purchase options"). In other words, while health and environmentally conscious consumers wish to purchase appropriate natural products, they do not typically look beyond label claims to ensure those claims are true, and often lack the expertise and/or information necessary to determine the veracity of the claims.

31.     Accordingly, manufacturers of beauty products are trending toward aggressively marketing their products as natural.  See Zhang at 1 (noting cosmetics companies were actively developing natural products to satisfy the "inevitable trend" to meet this demand).  These companies' advertising claims are often false or deceptive. This is true particularly for Beiersdorf, as described below.

**Beiersdorf Markets Its "Natural Origin" and "Naturally-Derived" Products to Consumers Who Prefer Natural Products**

32.     As noted above, the Products that are the subject of this Complaint are Beiersdorf's "Nourish by Nature" and "Naturally Good" skin care products sold under its Nivea brand, including, without limitation, all varieties of "Nourish by Nature" and "Naturally Good" body and skin lotions, moisturizers, and skin care products, including:

- "Nourish by Nature" Nourishing Avocado Enriched Body Lotion with "98% Naturally-Derived Ingredients* & Purified Water";

- "Nourish by Nature" Calming Lavender Enriched Body Lotion with "98% Naturally-Derived Ingredients* & Purified Water";

- "Nourish by Nature" Hydrating Aloe Enriched Body Lotion with "98% Naturally-Derived Ingredients* & Purified Water";

- "Naturally Good" Organic Aloe Vera Body Lotion "98% Ingredients of Natural Origin*";

- "Naturally Good" Organic Aloe Vera Micellar Face Wash "98% Ingredients of Natural Origin*";

- "Naturally Good" Bio Aloe Vera Deodorant with "95% Ingredients of Natural Origin*";

- "Naturally Good" Natural Lavender Body Lotion with "98% Ingredients of Natural Origin*";

- "Naturally Good" Organic Argan Oil Regenerating Night Cream "99% of Natural Origin**";

- "Naturally Good" Bio Aloe Vera Deodorant with "95% Ingredients of Natural Origin*";

- "Naturally Good" Jasmine & Chamomile Scent and Touch of Bio Oil Shower Gel "98% of Natural Origin."

A full list of the Products is included in Attachment C to this complaint.

33.     Each of the Products contains a representation that the Product is comprised of a specific percentage of "Natural Origin" or "Naturally-Derived" ingredients. (e.g., "98% Naturally-Derived Ingredients* & Purified Water"; "95% Ingredients of Natural Origin*"; "99% of Natural Origin**"). The exact verbiage varies between products, but the overall impression and meaning is consistent across products.

34.     This representation is placed on both the front labels of the product packaging for all the Products. It is in large, bold font on the front of the package, in a prominent location near the center of the Product Label.

35.     One or two asterisks follow the phrases "Naturally-Derived" and "Natural Origin," respectively, depending on the exact Product at issue. None of the Products have an asterisk statement on the front label explaining the meaning of the asterisk. None of the asterisks direct the reader to the ingredient list either. Instead, the asterisk(s) lead to a statement on the back label.

36.     For those products that use the phrase "Naturally-Derived*", the back-label asterisk statement is "*Naturally derived ingredients have undergone processing while retaining a majority of their natural molecular structure."

37.     For those products that use the phrase "Natural Origin*", the back-label asterisk statement is "*Ingredients sourced from nature retaining greater than 50% of their molecular structure (natural state) after being processed, including water." For some of the Products, such as the "Naturally Good" night and day creams, this "back label" statement actually appears on the underside of the product, separately from the ingredient list. On other products, such as the Micellar Wash, the asterisk does not lead to any visible asterisk statement.

38.     Appendix C includes the front and back labels for each of the "Nourish by Nature" and "Naturally Good" Products.

39.     A representative image of the "Nourish by Nature" Calming Lavender Enriched Body Lotion with "98% Naturally-Derived Ingredients* & Purified Water" is shown below:



40.     The front label of the "Nourish by Nature" Calming Lavender Enriched Body Lotion contains the statement "98% Naturally-Derived Ingredients* & Purified Water"" in large, highly visible text in the middle of the label. The "98%" is among the largest text on the label, larger even than the "Nivea" or "Naturally Good" brand names.  The front label also contains images of plants as its background. The other "Nourish by Nature" Products contain essentially

identical claims and analogous plant imagery. The label distinguishes synthetic from "Naturally-Derived" ingredients by also listing "2% Skin Safe Synthetic Ingredients."

41.    A representative image of the back label of the "Nourish by Nature" Calming Lavender Enriched Body Lotion is shown below:



42.    The "Nourish by Nature" back label above displays a table, the left column of which is designated "Naturally-Derived Ingredient*". This asterisk leads to the same statement as the front label: "naturally-derived ingredients have undergone processing while retaining a majority of the molecular structure." The back label also claims that "Nourish by Nature cares and moisturizes your skin with ***natural ingredients derived from nature***" (emphasis added); this implies that the "naturally-derived" ingredients are "natural."

43.     The table on the "Nourish by Nature" back label for the Avocado Enriched Body Lotion identifies the following ingredients as "Naturally-Derived": water, glycerin, denatured alcohol, cetearyl alcohol, coco-caprylate/caprate, cocoglycerides, glyceryl stearate SE, dicaprylyl ether, avocado oil, hydroxypropyl starch phosphate, glyceryl stearate, sodium cetearyl sterate, xanthum gum, and citric acid.  (For the other "Nourish by Nature" products, the avocado oil is replaced by lavender or aloe vera, respectively.).

44.     The back label also distinguishes the "2% skin safe synthetic ingredients" from "naturally-derived ingredients," stating these are "included to maintain the integrity of the product."  The back label further identifies the "skin safe synthetic ingredients" as  caprylyl glycol, hydroxyacetophenone, benzyl alcohol, ethylhexylglycerin, and "fragrance."

45.     Beiersdorf also sells "Naturally Good" brand of products, which make similar claims, but phrased as "X% of Natural Origin" or "X% Ingredients of Natural Origin."  Like the "Nourish by Nature" Products, the "Naturally Good" products use prominent images of plants on their front labels to buttress the perception they are plant-based.  And like the Real Botanicals products, the Certified Pure*Plants* Products are also comprised primarily of synthetic chemicals.

46.     Beiersdorf's web site includes a page for the "Nourish by Nature" Products that reinforces the messaging on the "Nourish by Nature" bottles by emphasizing that the lotions are "inspired by nature" and "uses ingredients derived from nature*" to "care and nourish your skin." The asterisk leads to the same statement as the Product label (i.e., "*naturally-derived ingredients have undergone processing while retaining a majority of the molecular structure").

**Beiersdorf's " "Naturally-Derived" and Natural Origin" Claims Are False and Misleading**

47.     The ingredient lists establish that natural ingredients such as avocado oil, lavender oil, and aloe vera are minor components of each Product.

48.     Of the listed "naturally-derived" ingredients for the "Nourish by Nature" Avocado Enriched Lotion, only water, alcohol, avocado oil, and possibly xanthum gum are actually obtained from nature.  All the remaining products are actually synthetic chemicals, made using standard industrial chemical processes.  Although a few of the ingredients are compounds

that can occur in nature (e.g., glycerin, citric acid), they are not obtained directly from natural sources when used on the scale necessary for commercial products.

49.     The exact ingredients vary from one Beiersdorf "Nourish by Nature" and "Naturally Good" product to the next, but they all establish that the Products are predominantly composed of ingredients produced using industrial chemical processes. For the lotions, such ingredients include glycerin, cetearyl alcohol, coco-caprylate/caprate, cocoglycerides, glyceryl stearate SE, dicaprylyl ether, hydroxypropyl starch phosphate, glyceryl stearate, sodium cetearyl sterate, and citric acid.  The ingredient lists identify some compounds, such as citric acid, that occur in nature but are manufactured using industrial processes to meet the demands of mass-produced goods like the Products..

50.     For example, of the 20 ingredients listed for the "Nourish by Nature" Avocado Enriched Lotion, 12 are industrially-produced chemicals that most consumers would not identify as "natural" or "naturally derived."  Further, since the labels explicitly state that the five admitted "synthetic" ingredients are only 2% of the Product, it necessarily follows that the 98% Naturally-Derived Ingredients" claim includes the 15 synthetic ingredients that are falsely characterized as "naturally-derived." Accordingly, if one were assessing the "% naturally derived ingredients" using an ordinary consumer's understanding of "naturally-derived" (i.e., the standard dictionary definitions of that term, one would measure the real % naturally-derived as less than 98%.

51.     In short, the Products are predominantly composed of ingredients that are produced using industrial chemical processes. These ingredients are not "naturally derived" or of "natural origin."

52.     On information and belief, even if one interpreted the claim to refer to the proportion by weight of the product that is *naturally derived (i.e., derived naturally, as opposed to through synthetic chemistry) or natural origin ingredients (i.e., naturally occurring compounds obtained from natural sources)*, the claim is not true.

53.     Defendant falsely and misleadingly refers to synthetic, industrially-manufactured chemicals as "naturally derived" by assigning them a "% naturally derived" value based on percentage of the synthetic molecule, by mass, that was present in a naturally derived starting

material. In other words, Defendant mischaracterizes industrial chemicals as "natural origin" or "naturally-derived" in order to "greenwash" the Products and make them seem safer and more environmentally friendly.

54. Defendant's "naturally derived"/"natural origin" characterizations are based on the British Standards Institute's ISO[1] 16128: "Guidelines on technical definitions and criteria for natural and organic cosmetic ingredients and products." This standard sets forth an algorithm for calculating the % of a product that is of "natural origin." It begins by defining "derived natural ingredients" as "cosmetic ingredients of greater than 50 % natural origin, by molecular weight, by renewable carbon content, or by any other relevant methods, obtained through defined chemical and/or biological processes with the intention of chemical modification." ISO 16128 goes on to define the "natural origin index" as "a value indicating the extent to which a cosmetic ingredient meets the definitions of either natural ingredients in ISO 16128-1:2016, Clause 2, derived natural ingredients from ISO 16128-1:2016, Clause 3, or derived mineral ingredients from ISO 16128-1:2016, Clause 4." Broadly speaking, the "value indicating the extent to which a cosmetic ingredient meets" the standards corresponds to the percentage by weight of the end product that was in a natural starting material. On information and belief, Defendant uses this same basic algorithm as used for "natural origin index" and reports the result as "% natural origin" or "% naturally derived."

55. ISO 16128 is unavailable to the public as a practical matter, as it is based on a 46-page proprietary standard (ISO 16128, parts 1:2016 ("Definitions for Ingredients") and 2:2017 ("Criteria for ingredients and products")) copyrighted by the British Standards Institute (BSI), a private, for-profit institution. The BSI forbids public distribution of the standard without its permission. Instead, the BSI sells the standard for roughly $400. As such, the BSI fails to disseminate the "standard" freely to the public at large.

---

[1] "ISO" is an acronym for 'International Organization for Standardization," which the BSI identifies as "a worldwide federation of national standards bodies."

56.     To obtain the standard in its entirety, a consumer would need to purchase two BSI publications costing a total of nearly $400. This is both unlikely and unreasonable for an ordinary consumer.

57.     The end result is that, for all intents and purposes, the public is entirely ignorant of how Beiersdorf calculates the percentage of ingredients that is naturally derived/natural origin and what Beiersdorf is communicating when it makes the naturally derived/natural origin claims.

58.     Even if the public did have access to ISO 16128, it is not designed for use in labeling and product communications—a fact which BSI states in the very first section of each volume of the standard. For instance, volume 2 states:

> Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), human safety, environmental safety, socio-economic considerations (e.g. fair trade), characteristics of packaging materials or regulatory requirements applicable for cosmetics.

(Emphasis added.).  It is inherently problematic for Defendant to use a standard that explicitly states it is not addressing consumer-facing product claims and labelling for those purposes.

59.     ISO 16128's definition of "natural origin index" is very complicated and entirely beyond the ability of an ordinary consumer to understand. Chemical reactions which may be used to create "derived natural" compounds under ISO 16128 include amidation, olefin metathesis, Aldol reactions, Knoevenagel condensation, Claisen condensation, sulphation, hydrolysis, hydrogenation, the Guerbet reaction, and any form of oxidation or reduction. The natural origin index for the product as a whole is then calculated using a weight-adjusted summation of the % natural origin for each of the constituent ingredients.

60.     ISO 16128 is also inappropriate for use in labeling because it does not require uniform calculations. Instead, it allows the party calculating the "natural origin index" (i.e., the % natural origin or naturally derived) to include or exclude added water, depending on the party's preference. Accordingly, the same product could have two different "% natural origin" indices (i.e., % naturally derived), depending on who calculated it.  The standard is also ambiguous in that it defines "derived natural" ingredients as those of 50% or more "natural origin," measured

by any of three criteria: "molecular weight," "renewable carbon content", or "any other relevant methods." But the standard does not define "renewable carbon content," nor what the "any other relevant methods" may be.  Laypeople are not versed in assessing molecular weights either.

61.     The stated purpose of ISO 16128 is "to encourage a wider choice of natural and organic ingredients in the formulation of a diverse variety of cosmetic products to encourage innovation." In other words, ISO 16128's purpose is to provide an expansive definition "natural origin" to encourage manufacturers to use "natural" materials as ingredients for manufacturing.

62.     ISO 16128 is not a government standard, nor even a publicly agreed to standard. The BSI created ISO 16128 without any public comment.  Based on information on the ISO web site, it appears that ISO 16128 was designed solely by cosmetic industry scientists, without involvement of any consumer advocates or persons familiar with consumer advertising.

63.     For comparison of ISO 16128's use of "naturally derived" to an ordinary consumer's understanding of that term, consider aspartame. It is an artificial sweetener, in the sense that it is entirely man-made and does not occur in nature.  But it is potentially 100% "natural origin" under ISO 16128, because all the starting materials used to make it (two amino acids and methanol) are naturally-occurring compounds. But most ordinary consumers would not view aspartame as natural or "100% naturally derived."  This underscores how misleading ISO 16128 is when used in advertising, as Defendant's Product labels do.

64.     Similarly, hydrogenated vegetable oils, synthetic materials created using an industrial process which cannot be advertised as "natural" in foods, would be advertised as ~99% "natural origin" in cosmetics using the ISO 16128 standard, because only the added hydrogens would be deemed "non-natural"; the overwhelming majority of the mass of the hydrogenated vegetable oils would be the carbon, hydrogen, and oxygen atoms in the original vegetable oils. While the standards applicable to foods do not legally control cosmetic advertising, the fact that such claims would not be allowed in the food context demonstrates that most ordinary consumers would view ISO 16128's characterization of hydrogenated oils as >90% naturally derived as false and misleading.

65.     Even dioxins, toxic materials produced as byproducts when burning wood, could be categorized as "90% "natural origin," since the bulk of the mass of the dioxins are from wood, which is a natural material. Again, this demonstrates how ISO16128 falsely and misleadingly characterizes synthetic compounds as primarily "naturally derived."

66.     ISO 16128 is particularly inappropriate for use in marketing beauty products because the chemicals used in many beauty products have particularly high molecular weights, such that even extensive chemicals modification is unlikely to change 50% or more of the starting ingredient's molecular weight.  That is particularly true for the fatty acids and esters used in shampoos, conditioners, and moisturizers.

67.     Ultimately, the only major group of chemicals deemed not "natural origin" or "naturally derived" under ISO 16128 is petroleum-based chemicals and new chemical materials whose mass is 50% or more derived from petrochemicals.  This demonstrates that the ISO 16128 is arbitrary, in that a material whose mass is 49% from petroleum will be categorized 51% naturally derived, but one whose mass is 50% from petroleum will be categorized 0% naturally derived.

68.     Defendant's labels are also misleading because, in combination with the labels' prominent and repeated references to natural ingredients such as "avocado oil," "aloe vera," and "lavender oil," Beiersdorf falsely suggests that plant-based compounds comprise a majority of the products' ingredients and/or weight.  Beiersdorf further reinforces this false and misleading claim by contrasting it with the "2%" claims for certain chemicals, which suggests that the "naturally derived"/"natural origin" ingredients are not industrially-manufactured chemicals, even though they actually are.

69.     As the examples above show, the "% Natural Origin"/"% Naturally Derived" claims made by Beiersdorf are even more confusing than "100% natural-origin" claims, because representing that, e.g., "80%" of ingredients are "natural-origin" requires the consumer to interpret how the 80% value was calculated. As a practical matter, "100% natural" always means the same thing, irrespective of how it is calculated. In contrast, a statement that a product is "80% natural-origin" ingredients is open to varying interpretations regarding whether that refers to a

percentage of ingredients, mass, volume, or other measurement, each of which could mean very different things with respect to how much of the product is "natural" of "naturally derived."

70.    Concerned observers have noted the trend of advertising products as being made from "naturally derived" ingredients is misleading.

71.    For example, Chagrin Valley Soap and Salve, a company dedicated to marketing products made from natural ingredients, notes:

**Derived From . . . Naturally Derived From . . . Made From . . . Quite Confusing**

You will often see these words listed before or after an ingredient in a skincare product. So what do they mean? As usual, there is no standard for these terms so the consumer is left scratching their heads and asking the question, "Is this product natural."

Coconut is still considered natural whether it is whole, dried, or shredded. We can even obtain natural coconut oil, coconut milk, and coconut with minimal changes to the original coconut. However, once the oil is biochemically altered, it then becomes naturally derived or even synthetic.

A product label will list a chemical ingredient followed by the phrase "derived from …some natural substance." For example, cocamide diethanolamine (cocamide DEA) can be derived from the fatty acids of natural coconut oil.

Although this ingredient may start out as natural coconut oil, by the time it is separated out using petrochemicals and chemical solvents, and further processed to create a foam boosting agent--it is far from coconut oil and far from natural!

A product label will list a chemical ingredient followed by the phrase "naturally derived from …some natural substance." The words "naturally derived" live in a gray area because it is difficult to know if the ingredient is closer to natural or synthetic.

Just how far down the road from its natural source has this ingredient traveled? Some of these ingredients may be minimally processed and therefore are closer to their natural source. But others have been processed many times and depending on the "process" they may not resemble the original botanical ingredient at all. What determines the "naturalness" of a derived ingredient totally depends on the type of process used to manufacture that ingredient. Unfortunately, the consumer is not provided with this information.

A product label will list a chemical ingredient followed by the phrase "made from …some natural substance." Your guess is as good as mine.

This type of labeling is misleading for consumers. https://www.chagrinvalleysoapandsalve.com/blog/posts/but-the-label-says-natural/ (last accessed December 6, 2022).

72.    Members of the Ninth Circuit have commented that Beiersdorf's "greenwashing" is a disturbing and increasingly common practice:

> . . . Beiersdorf's labeling nonetheless resembles a concerning practice known as "greenwashing." Greenwashing refers to "a set of deceptive marketing practices in which an entity publicly misrepresents or exaggerates the positive environmental impact or attributes of a product[.]" Amanda Shanor & Sarah E. Light, Greenwashing and the First Amendment, 122 Colum. L. Rev. 2033, 2037 (2022); see also *id*. at 2056–57. The practice of greenwashing has resulted from the increasing number of American consumers who want to buy environmentally friendly, or "green," products. See 16 C.F.R. § 260.1 ("the Green Guides").
>
> Greenwashing is not limited to environmental effects and is also used to describe the misleading or false labeling of a wide range of consumer products. For example, the practice of greenwashing also affects "the way consumers buy cosmetic and personal products." Alexa Riccolo, The Lack of Regulation in Preventing Greenwashing of Cosmetics in the U.S., 47 J. Legis. 120, 122 (2021). In the context of cosmetics and personal care products (e.g., shampoos and conditioners), the term is used to describe products that have "natural" labeling "but actually contain chemicals[.]" *Id*.

*McGinnity v. The Procter & Gamble Company*, No. 22-15080 (9th Cir. 2022) (J. Gould, concurring).    Although *McGinnity* affirmed dismissal of a false advertising claim against Beiersdorf arising from the phrase "Nature Fusion", that case is distinguishable because Beiersdorf argued that it had given notice to consumers that its ingredients were not "natural" by disclosing chemicals on the back label.    Here, Beiersdorf has advertised that those chemicals are naturally sourced; the ingredient list cannot act as notice that the chemicals are not natural if Beiersdorf is telling consumers that those same chemicals are "naturally derived" or of "natural origin."

73.    An ordinary consumer would not have the knowledge required to determine which of the ingredients is natural or naturally derived versus being the product of an industrial chemical process. There mere fact that an ingredient has a "chemical sounding" name is no

definitive indication whether it is natural or naturally derived versus synthetic. For example, citric acid is a naturally-occurring compound, but is produced industrially using either chemical synthesis or genetically-modified yeast. Cocamidopropyl betaine sounds like it might be natural, given the reference to coconuts in its name (i.e., "coc-"), but it is made in a two-step industrial process, beginning with the reaction of dimethylaminopropylamine with fatty acids from coconut or palm kernel oil, followed by use of chloroacetic acid to form the final product. Thus, despite sometimes using coconut oil as a starting material, there is nothing natural about it. As a result, these and other "naturally derived" claims made by Beiersdorf are false and misleading to consumers.

74.    In contrast, Beiersdorf knows or should know that its claims are false and/or misleading, because the BSI explicitly stated in the ISO 16128 publication that "Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), . . . characteristics of packaging materials or regulatory requirements applicable for cosmetics." In other words, the BSI told Beiersdorf and other third parties that the standard was not suitable for consumer communications (i.e., advertisements, labels, and marketing). Beiersdorf thus had actual or constructive knowledge that ISO 16128 was likely to deceive and/or confuse consumers.

75.    Beiersdorf's label claims conflict with official guidance from the Federal Trade Commission.  The "Green Guides," mentioned in *McGinnity*, instruct businesses to avoid "overstatement of environmental attributes," such as by characterizing an increase in recycled content from 2% to 3% as a "50% increase in recycled content," or advertising a trach bag as recyclable when trash bags are routinely not recycled. See 16 C.F.R. 230(c). Similarly, the Green Guides state that, even if a marketer explains and can substantiate a product's environmental benefits, advertisements of environmental benefits may be misleading if the advertisement otherwise implies deceptive claims. *See id.,* § 260.4. The Products' "natural origin"/ "naturally derived" ingredients claims are misleading in this respect, because they suggest that, because a majority of the molecular mass of the ingredients were sourced from non-petroleum sources, they are environmentally friendly and more "natural." This is misleading because a synthetic

chemical is not "natural" in any meaningful respect regardless of where its primary starting material was sourced, and there are many environmental effects that have no relation to the molecular mass of the starting material relative to the end product (e.g., the use of toxic chemicals in manufacturing, the identity of byproducts, the amount of energy used to manufacture the chemicals, etc.).

76.    The Green Guides also state it is deceptive to misrepresent, directly or indirectly, that a "product or package" is "made with renewable materials." 16 C.F.R. 260.16(a). As noted above, ISO 16128 identifies "renewable carbon content" as a basis for claiming a product is "naturally derived" or "natural origin." Accordingly, Beiersdorf's references to "natural origin" and "naturally derived" ingredients are also misleading because they fail to identify with sufficient specificity the basis for the natural content claims.

77.    In many cases, Beiersdorf's claims are based on the specious assumption that merely using a plant as the initial source of carbon content makes the resulting synthetic chemical environmentally friendly. This assumption is false because many of the ingredients (e.g., palm oil) begin as plants grown in environmentally damaging ways. While these ingredients come from plants, the monoculture plantations where such plants are grown are often made by clear-cutting rain forests and other natural habitats, resulting in substantial environmental degradation. Further, there is no guarantee those plants are grown using organic farming methods, as opposed to using pesticides and other environmentally-damaging chemicals. Accordingly, marketing these ingredients as environmentally-friendly by labeling them "Natural Origin" or "Naturally-Derived" is false or misleading. See Amberg, Resources at 3 (noting green cosmetics were aimed at "environmental conservation, minimization of polluting, responsible usage of non-renewable resources, and *preservation of fauna and species*) (emphasis added).

## PLAINTIFFS' ALLEGATIONS

**Aisley Davis**

78.    Plaintiff Aisley Davis purchased Beiersdorf "Naturally Good" Night Cream with 98% Natural Origin Ingredients" and "Naturally Good" Biodegradable Wipes with "97% Natural Origin Ingredients" from a Walmart in Redding in Shasta County, California in June of 2024.

79.    Plaintiff Davis made each of her purchases of the Beiersdorf "Naturally Good" products after reading and relying on the product labels that promised that the care products were made of "99% Natural Origin* Ingredients" and "97% Natural Origin* Ingredients," respectively.   She relied on the "X% Natural Origin* Ingredients" representation for each purchase and purchased each product because of the "X% Natural Origin* Ingredients" representations. She also believed in the truth of each representation, i.e., that the product was comprised of ingredients of which 99% and 97% were natural origin, respectively, using the ordinary definition of the phrase "natural origin." Had Defendant not made the "X% Natural Origin* Ingredients" claims on its packages in these circumstances, she would not have been drawn to the Products and would not have purchased them. At a minimum she would have paid less for each Product.

80.    Moreover, had Defendant adequately disclosed the proportion of ingredients that were naturally derived, Plaintiff Davis would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Davis regularly looks for natural, natural origin, and naturally-derived ingredients before purchasing products and uses that as a basis for buying and/or comparing similar products. The presence and amount of natural origin and naturally derived ingredients in a product is a material factor in purchasing decisions by Plaintiff Davis.

81.    Plaintiff Davis paid for each Product under the mistaken belief that the it was made of "99% [or 97%] Natural Origin Ingredients." The only information plaintiff had about the composition of the Product was the "X% Natural Origin* Ingredients" claim on the Product's label. She did not have any reason to believe that the Products were comprised of fewer than 99% (night cream) and 97% (wipes) natural origin ingredients, respectively, as claimed on the labels. Nor did she have any reason to know the Products consisted of anything less than 98% naturally-derived ingredients.

82.    Plaintiff Davis did not note the asterisk in the phrase "X% Natural Origin*" prior to making her purchase, nor did she see any asterisk-linked explanation on the front of the product label. Even if Plaintiff Davis had, the asterisk statement on the back label would not have clarified the truth of the product's composition, because the statement "*Ingredients

sourced from nature retaining greater than 50% of their molecular structure (natural state) after being processed, including water" is still misleading, as it fails to explicitly indicate to her as a layperson that the ingredients are synthetic, not "natural origin." Even having been informed of the meaning of the asterisk statement, Plaintiff views Defendant's conduct as a bait-and-switch tactic.

83.    Ms. Davis continues to be interested in skin and cosmetic products comprised of natural and naturally derived ingredients, and in particular the Beiersdorf Products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, she does not know whether any Beiersdorf Products she may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether her future purchases may subject her to similar economic harm.

**Julius Yarbough**

84.    Plaintiff Julius Yarbough purchased Beiersdorf "Naturally Good" Deodorant from a Walmart in Solano County, California on multiple occasions beginning in or around December of 2023.

85.    Plaintiff Yarbough made his purchase of the Beiersdorf "Naturally Good" product after reading and relying on the product labels that promised that the care products were made of  "98% Naturally-Derived* Ingredients." He relied on the "98% Naturally-Derived* Ingredients" representation for each purchase and purchased each product because of the "98% Naturally-Derived* Ingredients" representations. He also believed in the truth of each representation, i.e., that the product was comprised of ingredients of which 98% were naturally-derived, using the ordinary definition of the phrase "naturally-derived." Had Defendant not made the "98% Naturally-Derived* Ingredients" claims on its packages in these circumstances, he would not have been drawn to the Products and would not have purchased them. At a minimum he would have paid less for each Product.

86.    Moreover, had Defendant adequately disclosed the proportion of ingredients that were naturally derived, Plaintiff Yarbough would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Yarbough regularly looks for natural, natural

origin, and naturally-derived ingredients before purchasing products and uses that as a basis for buying and/or comparing similar products. The presence and amount of natural origin and naturally derived ingredients in a product is a material factor in purchasing decisions by Plaintiff Yarbough.

87.     Plaintiff Yarbough paid for the Product under the mistaken belief that the it was made of "98% naturally-derived ingredients." The only information plaintiff had about the composition of the Product was the "98% naturally-derived* ingredients" claim on the Product's label. He did not have any reason to believe that the Products were comprised of fewer than 98% naturally-derived ingredients as claimed on the labels. Nor did he have any reason to know the Products consisted of anything less than 98% naturally-derived ingredients.

88.     Plaintiff Yarbough did not note the asterisk in the phrase "98% naturally-derived* ingredients" prior to making his purchase, nor did he see any asterisk-linked explanation on the front of the product label. Even if Plaintiff Yarbough had, the asterisk statement on the back label would not have clarified the truth of the product's composition, because the statement "*naturally-derived ingredients have undergone processing while retaining a majority of the molecular structure" is still misleading, as it fails to explicitly indicate to him as a layperson that the ingredients are synthetic, not "naturally-derived." Even having been informed of the meaning of the asterisk statement, Plaintiff views Defendant's conduct as a bait-and-switch tactic.

89.     Mr. Yarbough continues to be interested in skin and cosmetic products comprised of natural and naturally derived ingredients, and in particular the Beiersdorf Products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, he does not know whether any Beiersdorf Products he may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether his future purchases may subject him to similar economic harm.

1 **Valerie Robins**

2    90.    Plaintiff Valerie Robins purchased Beiersdorf "Naturally Good" Argan Oil

3 Regenerating Night Cream with 99% Natural Origin ingredients from a Walmart in Solano

4 County, California in or around October 2024.

5    91.    Plaintiff Valerie Robins each of her purchases of the Beiersdorf "Nourish by

6 Nature"  product after reading and relying on the product labels that promised that the care

7 products were made of  "98% Naturally-Derived* Ingredients." She relied on the "98%

8 Naturally-Derived* Ingredients" representation for each purchase and purchased each product

9 because of the "98% Naturally-Derived* Ingredients" representations. She also believed in the

10 truth of each representation, i.e., that the product was comprised of ingredients of which 98%

11 were naturally-derived, using the ordinary definition of the phrase "naturally-derived." Had

12 Defendant not made the "98% Naturally-Derived* Ingredients" claims on its packages in these

13 circumstances, she would not have been drawn to the Products and would not have purchased

14 them. At a minimum she would have paid less for each Product.

15    92.    Moreover, had Defendant adequately disclosed the proportion of ingredients that

16 were naturally derived, Plaintiff Robins would not have purchased the Products or would have,

17 at minimum, paid less for them. Plaintiff Robins regularly looks for natural, natural origin, and

18 naturally-derived ingredients before purchasing products and uses that as a basis for buying

19 and/or comparing similar products. The presence and amount of natural origin and naturally

20 derived ingredients in a product is a material factor in purchasing decisions by Plaintiff Robins.

21    93.    Plaintiff Robins paid for the Product under the mistaken belief that the it was

22 made of "98% naturally-derived ingredients." The only information plaintiff had about the

23 composition of the Product was the "98% naturally-derived* ingredients" claim on the Product's

24 label. She did not have any reason to believe that the Products were comprised of fewer than

25 98% naturally-derived ingredients as claimed on the labels. Nor did she have any reason to know

26 the Products consisted of anything less than 98% naturally-derived ingredients.

27    94.    Plaintiff Robins did not note the asterisk in the phrase "98% naturally-derived*

28 ingredients" prior to making her purchase, nor did she see any asterisk-linked explanation on the

front of the product label. Even if Plaintiff Robins had, the asterisk statement on the back label would not have clarified the truth of the product's composition, because the statement "*naturally-derived ingredients have undergone processing while retaining a majority of the molecular structure" is still misleading, as it fails to explicitly indicate to her as a layperson that the ingredients are synthetic, not "naturally-derived." Even having been informed of the meaning of the asterisk statement, Plaintiff views Defendant's conduct as a bait-and-switch tactic.

95.     Ms. Robins continues to be interested in skin and cosmetic products comprised of natural and naturally derived ingredients, and in particular the Beiersdorf Products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, she does not know whether any Beiersdorf Products she may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether her future purchases may subject her to similar economic harm.

**Marisol Scharon**

96.     Plaintiff Marisol Scharon purchased Beiersdorf "Nourish by Nature" Aloe Vera 98% Naturally-Derived Body Lotion from a CVS in San Pedro in Los Angeles County, California in or around November 2024.

97.     Plaintiff Scharon made each of her purchases of the Beiersdorf "Nourish by Nature" product after reading and relying on the product labels that promised that the care products were made of "98% Naturally-Derived* Ingredients." She relied on the "98% Naturally-Derived* Ingredients" representation for each purchase and purchased each product because of the "98% Naturally-Derived* Ingredients" representations. She also believed in the truth of each representation, i.e., that the product was comprised of ingredients of which 98% were naturally- derived, using the ordinary definition of the phrase "naturally-derived." Had Defendant not made the "98% Naturally-Derived* Ingredients" claims on its packages in these circumstances, she would not have been drawn to the Products and would not have purchased them. At a minimum she would have paid less for each Product.

98.     Moreover, had Defendant adequately disclosed the proportion of ingredients that were naturally derived, Plaintiff Scharon would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Scharon regularly looks for natural, natural origin, and naturally-derived ingredients before purchasing products and uses that as a basis for buying and/or comparing similar products. The presence and amount of natural origin and naturally derived ingredients in a product is a material factor in purchasing decisions by Plaintiff Scharon.

99.     Plaintiff Scharon paid for the Product under the mistaken belief that the it was made of "98% naturally-derived ingredients." The only information plaintiff had about the composition of the Product was the "98% naturally-derived* ingredients" claim on the Product's label. She did not have any reason to believe that the Products were comprised of fewer than 98% naturally-derived ingredients as claimed on the labels. Nor did she have any reason to know the Products consisted of anything less than 98% naturally-derived ingredients.

100.    Plaintiff Scharon did not note the asterisk in the phrase "98% naturally-derived* ingredients" prior to making her purchase, nor did she see any asterisk-linked explanation on the front of the product label. Even if Plaintiff Scharon had, the asterisk statement on the back label would not have clarified the truth of the product's composition, because the statement "*naturally-derived ingredients have undergone processing while retaining a majority of the molecular structure" is still misleading, as it fails to explicitly indicate to her as a layperson that the ingredients are synthetic, not "naturally-derived."  Even having been informed of the meaning of the asterisk statement, Plaintiff views Defendant's conduct as a bait-and-switch tactic.

101.    Ms. Scharon continues to be interested in skin and cosmetic products comprised of natural and naturally derived ingredients, and in particular the Beiersdorf Products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, she does not know whether any Beiersdorf Products she may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether her future purchases may subject her to similar economic harm.

**Kathryn Bowman**

102.    Plaintiff Kathryn Bowman purchased "Naturally Good" Face Cleanser with "98% Ingredients of Natural Origin*" from a Walmart store in Carmichael, California in 2024. Plaintiff Bowman viewed and relied upon the product label, including the statement that it was "98% Ingredients of Natural Origin*," when purchasing the "Naturally Good" Essential Botanicals products.

103.    Plaintiff Bowman made each of his purchases of the Beiersdorf products after reading and relying on the product labels that promised that the care products were made of "98% Ingredients of Natural Origin*." She relied on the "98% Ingredients of Natural Origin*" representation for each purchase and purchased each product because of the "98% Ingredients of Natural Origin*" representations. She also read and relied upon the ancillary label representations indicating the products were "botanical" in nature, and comprised of apricots and aloe vera, including imagery of apricots and aloe vera. She also believed in the truth of each representation, i.e., that the product was comprised of ingredients of which 98% were natural origin, using the ordinary definition of the phrase "natural origin." Had Defendant not made the "98% Ingredients of Natural Origin*" claims on its packages in these circumstances, she would not have been drawn to the Products and would not have purchased them. At a minimum She would have paid less for each Product.

104.    Moreover, had Defendant adequately disclosed the number of ingredients that were naturally derived, Plaintiff Bowman would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff Bowman regularly looks for natural, natural origin, and naturally-derived ingredients before purchasing products and uses that as a basis for buying and/or comparing similar products. The presence and amount of natural origin and naturally derived ingredients in a product is a material factor in purchasing decisions by Plaintiff Bowman.

105.    Plaintiff Bowman paid for the Product under the mistaken belief that the it was made of 98% Ingredients of Natural Origin. The only information plaintiff had about the composition of the Product was the "98% Ingredients of Natural Origin*" claim on the Product's label. Although She saw the "98% Ingredients of Natural Origin*" claim, she overlooked the

asterisks and associated statement due to their small size. She did not have any reason to believe that the Products were comprised of fewer than 98% naturally derived ingredients as claimed on the labels. Nor did she have any reason to know the Products consisted of anything less than 98% natural origin ingredients.

106.    Plaintiff Bowman did not note the asterisk in the phrase "X% Natural Origin*" prior to making her purchase, nor did she sha any asterisk-linked explanation on the front of the product label. Even if Plaintiff Bowman had, the asterisk statement on the back label would not have clarified the truth of the product's composition, because the statement "*Ingredients sourced from nature retaining greater than 50% of their molecular structure (natural state) after being processed, including water" is still misleading, as it fails to explicitly indicate to her as a layperson that the ingredients are synthetic, not "natural origin." Even having been informed of the meaning of the asterisk statement, Plaintiff views Defendant's conduct as a bait-and-switch tactic.

107.    Ms. Bowman continues to be interested in skin and cosmetic products comprised of natural and naturally derived ingredients, and in particular the Beiersdorf products, and similar care products marketed as comprised of natural and naturally derived ingredients. However, she does not know whether any Beiersdorf skin care products he may purchase in the future will be subject to the same false advertising, and thus is subject to uncertainty whether her future purchases may subject her to similar economic harm.

## CLASS ALLEGATIONS

108.    Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons in who purchased, in the State of California, the Products from April 25, 2021 to the present.

109.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

110.    Numerosity: Plaintiffs do not know the exact size the Class, but they estimate that each is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

111.    Common Questions Predominate: This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, misleading, and/or false statements and omissions that led them to believe that the Products were composed of specific proportions of naturally derived ingredients when they were not. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant deceptively, unlawfully, and/or unfairly misrepresented to the Class that the Products were comprised of "X% naturally derived"/"X% Natural Origin," plant-based ingredients;

b.    Whether Defendant's actions violate California laws invoked herein;

c.    Whether Defendant's advertising and marketing regarding the Products was likely to deceive reasonable consumers;

d.    Whether Defendant's representations or omissions are material to reasonable consumers;

e.    Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

f.    The amount of profits and revenues earned by Defendant as a result of the conduct;

g.    Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

CLASS ACTION COMPLAINT

h.      Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

112.    Typicality: Each Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

113.    Adequacy of Representation: Each Plaintiff will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which she complains. Each Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

114.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it

difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

115. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### PLAINTIFFS' FIRST CAUSE OF ACTION
**(Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Each Plaintiff and the Class**

116. Each Plaintiff realleges and incorporates by reference all preceding paragraphs of this Class Action Complaint as if fully set forth herein.

117. As set forth above, Defendant falsely and/or deceptively represented to each Plaintiff and those similarly situated that the Products were comprised of X% naturally derived/natural origin ingredients and/or primarily of plant-based materials when, in fact, the Products were not. (Specifically, Defendant advertised the Products as 90% to 97% naturally-derived/natural origin ingredients, depending on the specific product.) Defendant knew that the Products were not comprised of "X% naturally derived"/"X% natural origin" ingredients or made primarily from plant-based materials, yet advertised that they were. Defendant made false and/or deceptive representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were comprised of ≥X% naturally derived/natural origin ingredients and comprised primarily of plant-based materials.

118. Defendant's misrepresentations were material at the time they were made. They concerned material facts that were essential to the purchasing decisions of Plaintiffs and those similarly situated. Hair and skin care products that are not X% naturally derived ingredients or made primarily from plant based materials are worth less to consumers than such products that are.

119. Each Plaintiff and those similarly situated reasonably relied to their detriment on Defendant's representations. Had each Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

120.    By and through such fraud, deceit, and/or misrepresentations, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced each Plaintiff and those similarly situated to, without limitation, purchase the Products.

121.    As a direct and proximate result of Defendant's fraud and misrepresentations, each Plaintiff and those similarly situated have suffered damages. In particular, each Plaintiff seeks to recover on behalf of himself or herself and those similarly situated the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Products and the price they would have paid but for Defendant's misrepresentations), in an amount to be proven at trial.

122.    Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

## PLAINTIFFS' SECOND CAUSE OF ACTION
### (Violation of the Consumers Legal Remedies Act,
### California Civil Code § 1750, et seq.)
### On Behalf of Each Plaintiff and the Class

123.    Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

124.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA").

125.    Defendant's actions, representations, omissions, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

126.    Each Plaintiff and other members of the class are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

127.    The Products that each Plaintiff and similarly situated members of the class purchased are "goods" within the meaning of California Civil Code § 1761.

128.    By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, as described above, Defendant has violated, and continues to violate,

§§ 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant represented source, sponsorship, approval, or certification of goods or services that they do not have. In violation of California Civil Code §1770(a)(3), Defendant represented affiliation, connection, or association with, or certification by, another that they do not have. In violation of California Civil Code §1770(a)(5), Defendant represented that goods have approval, characteristics, uses, benefits, and qualities that they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(9), Defendant advertised goods with intent not to sell them as advertised.

129.    Specifically, Defendant's acts and practices led consumers to believe that X% of the ingredients in the Products were naturally derived or of natural origin, when they were not. Defendant additionally made representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were primarily plant-based, including use of avocado oil, lavender oil, aloe vera, and other natural materials as predominant ingredients.

130.    Further, Defendant omitted material facts that it had a duty to disclose, as alleged above.

131.    Defendant's concealment of the true characteristics of the Products was material to Plaintiffs and Class members. Had they known the truth, Plaintiffs and the Class members would not have purchased the Products, or would have paid significantly less for them.

132.    Defendant, as explained above, had an ongoing duty to Plaintiffs and the Class members to refrain from unfair and deceptive practices under the CLRA in the course of their business. Specifically, Defendant owed Plaintiffs and Class members a duty to disclose material facts concerning the Products because it possessed exclusive knowledge, it intentionally concealed them from Plaintiffs and Class members, and/or it made partial representations that were misleading since it concealed the aforementioned facts.

133.    Plaintiffs and Class members had no way of learning the facts that Defendant had concealed or failed to disclose because they were not experts in chemistry or chemical manufacturing, and did not have access to information regarding which materials Defendant considered "naturally derived" or "natural origin", nor its basis for that characterization.

134.    Plaintiffs and class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and/or failure to disclose material information.

135.    Each Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and other members of the class will continue to suffer harm.

136.    On February 6, 2025, Plaintiff Kent provided Defendant with notice and demand on behalf of himself and all others similarly situated that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein via U.S. mail. Plaintiff Burrola also provided notice on November 11, 2024.  Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Plaintiff similarly provided notice via U.S. mail in 2024. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

137.    Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFFS' THIRD CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, et seq. ("FAL"))**
**On Behalf of Each Plaintiff and the California Class**

138.    Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

139.    Beginning at an exact date unknown to each Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products, and in particular those advertised as being "X% naturally derived ingredients" and/or "X% Ingredients of Natural Origin" and plant-based.

140.    As set forth in this Class Action Complaint, Defendant has made representations and statements (by omission and commission) that led reasonable consumers to believe that various specific percentages (generally 90-97%) of the ingredients in the Products were naturally derived and/or of natural origin. Defendant additionally made representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were primarily plant-based.

141.    Each Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, paying less for the Products.

142.    Defendant's acts and omissions are likely to deceive the general public.

143.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

144.    The aforementioned practices, which Defendant has used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

145.    Each Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Though Plaintiffs did not buy the Products directly from Defendant, a certain amount of money

flowed from Plaintiffs who purchased the Products through retailers to Defendant. Plaintiffs seek restitution of those amounts. If Plaintiffs' and class members' claims at law fail, Plaintiffs, those similarly situated and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered. Each Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein.

146. Each Plaintiff and those similarly situated are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading and deceptive advertising, and injunctive relief restraining Defendant from engaging in any such advertising and marketing practices in the future. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. Even where Defendant has discontinued certain products and/or removed the "X% naturally derived" claim for a given Product, it has simultaneously introduced new products making the same false and misleading claims. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

147. As a direct and proximate result of such actions, each Plaintiff and the other members of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

## PLAINTIFFS' FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### On Behalf of Each Plaintiff and the Class

148. Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

149.    In selling the Products to consumers, Defendant made false and misleading statements regarding them, as described more fully above. Defendant deceptively failed to inform consumers, at the time of their purchase, that less than X% of the ingredients claimed in the Products were naturally derived or natural origin. Defendant additionally made representations and statements (by omission and commission) that led reasonable consumers to believe that that the Products were X% "naturally derived ingredients" and/or X% "Ingredients of Natural Origin" and plant-based.

150.    These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Plaintiffs and those similarly situated regarding how much to pay for the Products.

151.    Defendant made identical misrepresentations and omissions to members of the Class regarding the Products.

152.    Defendant should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

153.    By and through such negligent misrepresentations, Defendant intended to induce each Plaintiff and those similarly situated to alter their position to their detriment. Specifically, Defendant negligently induced each Plaintiff and those similarly situated, without limitation, to purchase the Products at the price they paid.

154.    Each Plaintiff and those similarly situated reasonably relied on Defendant's representations. Specifically, each Plaintiff and those similarly situated paid as much as they did for the Products.

155.    Because Plaintiffs reasonably relied on Defendant's false representations, each Plaintiff and those similarly situated were harmed in the amount of the price premium they paid (i.e., the difference between the price they paid for the Products and the price they would have paid but for Defendant's misrepresentations).

CLASS ACTION COMPLAINT

**PLAINTIFFS' FIFTH CAUSE OF ACTION**
**(Unfair, Unlawful and Deceptive Trade Practices,**
**Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Each Plaintiff and the California Class**

156.    Each Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

157.    Within four (4) years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendant has engaged in, and continues to engage in, unfair, unlawful and deceptive trade practices in California by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendant has engaged in, and continues to engage in, unfair, unlawful and deceptive trade practices by, without limitation, the following:

    a.    engaging in misrepresentation and omissions as described herein;

    b.    violating the California Consumer Legal Remedies Act as described herein;

    c.    violating the FAL as described herein.

158.    Each Plaintiff and those similarly situated relied to their detriment on Defendant's unfair, deceptive and unlawful business practices. Had each Plaintiff and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation, not paying for, or, at a minimum, paying less for the Products.

159.    Defendant's acts and omissions are likely to deceive the general public.

160.    Defendant engaged in these unlawful, deceptive, and unfair practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

161.    In addition to the unlawful and deceptive acts described above, Defendant engaged in unfair practices by violating the Federal Trade Commission's guides against bait advertising. 16 C.F.R. §§ 238.1-4. The policy provides that "No statement or illustration should be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser

may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). Defendant's aforementioned acts violated this policy, including its representations that the Products comprised "X% naturally derived ingredients" and/or "X% Ingredients of Natural Origin" and that plant materials such as avocado oil, lavender, and aloe vera were major ingredients.

162.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.

163.    As a direct and proximate result of such actions, each Plaintiff and the other members of the Class have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Class lost the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Products and the price they would have paid but for Defendant's misrepresentations), in an amount to be proven at trial. If Plaintiffs' and class members' claims at law fail, Plaintiffs, those similarly situated and/or other consumers will have no adequate remedy at law by which they can obtain recovery for the economic harm they have suffered.

164.    Each Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

165.    Each Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendant from offering the Products within a reasonable time after entry of judgment with the unlawful claims. Even where Plaintiff has discontinued certain products and/or removed the "X% naturally derived" claim for a given product, it has simultaneously introduced new products making the same false and misleading claim. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal

redress in order to recover monies paid to Defendant to which Defendant was not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PRAYER FOR RELIEF

**WHEREFORE**, each Plaintiffs, on behalf of themselves and those similarly situated, respectfully requests that the Court enter judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.    An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.    An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.    An award of treble damages, except for those causes of action where treble damages are not legally available;

G.    An award of restitution in an amount to be determined at trial;

H.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.    For reasonable attorneys' fees and the costs of suit incurred; and

J.    For such further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 25, 2025

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GUTRIDE SAFIER LLP**

*/s/Anthony J. Patek*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Anthony J. Patek (State Bar No. 228964)
  anthony@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# APPENDIX A

# CLRA DECLARATION

I, Marisol Scharon, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      As set forth in my complaint, I purchased the NIVEA "Nourish by Nature" Body Lotion form a CVS Pharmacy in San Pedro, California within the last year. I purchased the product in reliance on claims made by NIVEA that the Product is made with "98% naturally derived ingredients," believing that this claim meant that the Product was safer and less toxic than non-natural body lotions, and had less of an impact on the environment.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 26  day of March, 2025 in San Pedro, California.



_____
Marisol Scharon

Doc ID: b7606914957cff2f0e5b2407e4fed0c9bc41cdc2

# APPENDIX B

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CLRA DECLARATION

I, Aisley Davis, declare:

1.　　I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.　　I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.　　As set forth in my complaint, I purchased the NIVEA "Naturally Good" Night Cream with "98% Natural Origin Ingredients" and "Naturally Good" Biodegradable Wipes with a "97% Natural Origin Ingredients" from a Walmart in Redding in Shasta County, California in June of 2024.

4.　　I made each of these purchases of the NIVEA "Naturally Good" products after reading and relying on the product labels that promised that the care products were made of "99% Natural Origin* Ingredients" and "97% Natural Origin* Ingredients."

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 26 day of March, 2025 in Douglas City, California.

_____

Aisley Davis

---

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

Doc ID: 1808a3b2781f4c7a8b294fe47d675894a14a030e

# APPENDIX C

| | Product | Package Claims | Product Images |
|---|---|---|---|
| **Nivea Nourished by Nature Products** | | | |
| 1. | Calming, Lavender Enriched | "98% Naturally Derived" |  |

| 2. | Nourishing, Avocado Enriched | "98% Naturally Derived" |  |

| 3. | Hydrating, Aloe Enriched | "98% Naturally Derived Ingredients" |  |

| **Nivea Naturally Good Products** | | | |
|---|---|---|---|
| 4. | Micellar Water, Organic Aloe Vera | "98% of Natural Origin" |  |





| 5. | Micellar Face Wash, Organic Aloe Vera | "99% of Natural Origin" |  |
|---|---|---|---|

| 6. | Regenerating Night Cream, Organic Argan Oil | "99% of Natural Origin" |  |

| 7. | Day Care Radiance, Organic Aloe Vera | "99% of Natural Origin" |  |

| 8. | Day Cream Sensitive, Organic Chamomile | "99% of Natural Origin" |  |

| 9. | Day Cream, Anti Age Organic Burdock Extract | "99% of Natural Origin" |  |



| 10. | Cleansing Wipes. Organic Aloe Vera | "97% of Natural Origin" |  |

| 11. | Body Lotion, Natural Avocado | "98% of Natural Origin" |  |

| 12. | Body Lotion, Natural Lavender | "98% of Natural Origin" |  |

| 13. | Body Lotion, Natural Oats | "98% Ingredients of Natural Origin" |  |

| 14. | Deodorant, Bio Aloe Vera | "95% Ingredients of Natural Origin" |  |
|-----|--------------------------|-------------------------------------|----------------------|

| 15. | Deodorant, Bio Green Tea | "95% Ingredients of Natural Origin" |  |

| 16. | Shower Gel, Lily of the Valley & Oil | "98% Ingredients of Natural Origin" |  |

| 17. | Shower Gel, Orange Blossom & Oil | "98% Ingredients of Natural Origin" |  |

| 18. | Shower Gel, Plum Blossom & Oil | "98% Ingredients of Natural Origin" |  |
| --- | --- | --- | --- |

| 19. | Shower Gel, Jasmine & Chamomile Scnet & Touch of Bio Oil | "98% Ingredients of Natural Origin" |  |

**Nivea Fresh Blends Products**

| 20. | Refreshing Shower, Raspberry Blueberry Almond Milk | "90% Naturally Derived Ingredients" |  |

| 21. | Refreshing Shower, Apricot Mango Rice Milk | "90% Naturally Derived Ingredients"<br><br>"91% Naturally Derived Ingredients" |  |



| 22. | Refreshing Shower Watermelon Mint Coconut Milk | "90% Naturally Derived"<br><br>"91% Naturally Derived Ingredients" |  |

| 23. | Refreshing Shower, Banana Acai Coconut Milk | "Naturally Derived Ingredients" |  |
|-----|------|------|------|

**Nivea Lip Care**

| 24. | Pearly & Pink Lip Care | "98% Naturally Derived Ingredients" |  |
|-----|------------------------|-------------------------------------|----|

| 25. | Cherry Lip Care | "98% Naturally Derived Ingredients" |  |

| 26. | Cherry & Cream Lip Care | "98% Naturally Derived Ingredients" |  |

| 27. | Berry & Cherry Lip Care | "98% Naturally Derived Ingredients" |  |
| --- | --- | --- | --- |

| 28. | Moisture Lip Care | "99.5% Naturally Derived Ingredients" |  |

| 29. | Strawberry Lip Care | "98% Naturally Derived Ingredients" |  |